No. 48.—GEORGE SHIELDS, plaintiff in error, vs. GEORGE YONGE, Superintendant· of the Western & Atlantic Railroad, defendant in error.

[1.] In cases of involuntary manslaughter, in the performance of a lawful act, "where there has not been observed necessary discretion and . caution", as they are cases that do not amount to felonies, the private injury is *not* merged in the public, or suspended until the public has· been avenged.

[2.] A father may sue for injuries to his minor son, as for injuries to a servant, if the son is old enough to render service.

[3.] "A servant, when he engages to serve a master, undertakes, as between him and his master, to run all the ordinary risks of the service; and this includes the risk of negligence, on the part of a fellow servant, whenever he is acting in discharge of his duty, as servant of him who is the common master of both".

*Case*, in Whitfield Superior Court. Decision by Judge JNO. H. LUMPKIN, April Term, 1854.

This was a suit by George Shields, against George Yonge, as Superintendant of the Western & Atlantic Railroad, for the death of a minor son of the plaintiff, caused by the negligence of employees of the Western & A. R. R. One count in the declaration, alleged that the son was upon the train as a passenger, by contract for safe-carrying, with the father. Another count alleged, that he was employed on the train as a fireman, by contract with the father. The damages alleged were, loss of service, until the son arrived at the age of twenty-one years ; loss of service, during the one hour during which

the boy survived after the accident occurred; and a special damage, by reason of the grief to the mother, causing an attack of sickness, and consequent loss of service to the plaintiff.

On motion, the presiding Judge non-suited the plaintiff, on the ground, that there was no good cause of action set forth in the declaration.

This decision is assigned as error.

WRIGHT and JOHNSON, for plaintiff in error.

AKIN and UNDERWOOD, for defendant in error.

*By the Court.*—BENNING, J. delivering the opinion.

Is either count in the declaration good?

In *Baker vs. Bolton and others*, in *Campbell's. Nisi Prius Cases*, Lord *Ellenborough* is reported to have used these words: "in a Civil Court, the death of a human being could not be complained of as an injury". No authority is cited for this opinion.

In *Comyn's Digest*, "*Trespass*", (*b.* 5,) it is said, "so it (trespass) lies by a master, for the battery of a servant, *per quod*, &c., *after the death* of the servant"; and 2 *Rol.* 568, *l.* 42, is cited.

On the contrary, in *Bacon's Abridgment*, "*Master and Servant*", (*O*,) it is laid down, that "if a man beats another's servant to that degree that *he dies thereof*, the master loses his action, and must proceed by indictment—for the private injury to him, is drowned in the general injury to the public"; and for this, is cited, among other authorities, the same, 2 *Roll. Abr.* 568.

*Rolle's Abridgement*, itself, is not within my reach; and, therefore, I cannot find out which position it supports—that of *Bacon* or that of *Comyn*.

Let it be admitted, however, that *Rolles' Abridgement* supports the position of *Bacon*, and that that position is right,

what, then, does that position amount to? *Blackstone*, it is conceived, answers this question.

*Blackstone* says, "In all cases, the crime includes an injury—every public offence is also a private wrong, and somewhat more—it affects the individual, and it likewise affects the community". "Murder is an injury to the life of an individual, but the law of society considers, principally, the loss which the State sustains, by being deprived of a member, and the pernicious example thereby set, for others to do the like. Robbery may be considered in the same view—it is an injury to *private* property; but were that all, a civil satisfaction, in damages, might atone for it. The *public* mischief is the thing, for the prevention of which, our laws have made it a capital offence. In these gross and atrocious injuries, the private wrong is swallowed up in the public. We seldom hear any mention made of satisfaction to the individual—the satisfaction to the community being so very great. And, indeed, as the public crime is not otherwise avenged, than by forfeiture of life and property, it is impossible, afterwards, to make any reparation for the private wrong, which can only be had from the body or goods of the aggressor. But there are crimes of an inferior nature, in which the public punishment is not so severe; but it affords room for a private compensation also.— And herein, the distinction of crimes, from civil injuries, is very apparent. For instance, in the case of battery or beating another, the aggressor may be indicted for this, at the suit of the King, for disturbing the public peace, and be punished criminally, by fine and imprisonment; and the party beaten, may also have his private remedy, by action of trespass, for the injury which he, in particular, sustains, and recover a civil satisfaction in damages". (4 *Black. Com.* 6.)

According to this, in "*gross and atrocious* injuries, the private wrong is *swallowed up* in the public"; but is not, "in crimes of an *inferior* nature". What is meant by *gross and atrocious injuries?* Those which are "avenged by forfeiture of life and property"; or, perhaps, by forfeiture of property only. Those, certainly, are meant, which are avenged by *such*

a forfeiture as renders it "impossible, afterwards, to make any reparation for the private wrong"; and a forfeiture of property only, is such a forfeiture as does this.

What "injuries" are those which are so avenged? All of the degree of *felony*. "Felony, in the general acceptation of our English Law, comprises every species of crime which occasioned, at Common Law, the forfeiture of lands and goods". (4 *Black. Com.* 94.)

And, as to felonies, *Blackstone* also says : "not only all offences now capital, are, in some degree or other felony, but that this is likewise the case with some other offences, which are not punished with death—as suicide, where the party is already dead—homicide, by *chance-medley* or in self-defence, and petit larceny or pilfering—all which are, (strictly speaking,) felonies, as they subject the committer of them to forfeitures".

Speaking again of homicide, "*by misadventure and self-defence*", he says, "the penalty inflicted by our laws, is said, by Sir *Edward Coke*, to have been, anciently, no less than death—which, however is, with reason, denied by later and more accurate writers. It seems, rather, to have consisted in a forfeiture, some say, of all the goods and chattels", (i. e. of all that, at Common Law, could be reached, for satisfaction of a debt)—"others of only a part of them, by way of fine or *weregild*. But, the delinquent has now, and has had, as early as our records will reach, a pardon and writ of restitution of his goods, as a matter of course and right. And, indeed, to prevent this expense, in cases where the death has notoriously happened by misadventure or in self-defence, the Judges will usually permit (if not direct) a general verdict of acquittal". (*Ib.* 188.) .

The amount of this is, that anciently, homicide, even by misadventure, or in self-defence, was a felony; and that 'now', it is no crime at all—now it is "*excusable*". And this is the same as saying, that by the English Law, *all* homicide is, and has always been, either *felonious* or *innocent*—as saying, that

there neither is, nor has been, any intermediate kind, that may rank as a *misdemeanor*.

Indeed, his division of homicide is into three kinds—justifiable, excusable and felonious; and in making this division, he places homicide, by misadventure, and in self-defence, under the head of 'excusable'. By the ancient law, it would have been to be placed under the head of felonious—since it has got to be excusable, it may, without impropriety, be said to have become innocent; that is to say, to have become a sort of homicide that is not an injury of any kind, either public or private.

When, therefore, *Blackstone* says, that in "gross and atrocious injuries, the private wrong is swallowed up in the public", he, in effect says, that the private wrong is so swallowed up in *all* homicides that are injuries—for all homicides that are injuries at all, are injuries which amount to felonies; and in all felonies, the private wrong is so swallowed up.

But how 'swallowed up'? What does he mean by these words? Does he mean that the private injury is merged in the public, so as to be forever gone; or does he mean that it is merely merged *for a time*—that it is only *suspended* until the public injury shall have been avenged? Manifestly, he means the latter; for he puts the proposition, that after reparation has been made for the public wrong, no reparation is to be made for the private wrong—not upon the ground that no reparation is then due for that private wrong, but upon the ground, that it is practically impossible that reparation for it should be made—all, out of which reparation could be made, having already been used up, in making reparation for the public wrong —all having gone in forfeiture to the public. This is the same as saying, that if, after reparation is made to the public, there is anything left, out of which reparation may be made to the private man, he will be entitled to reparation—that is, that the private man has a *right* to reparation, after reparation to the public; but that, practically, this right is nugatory as repara-

tion to the public, consumes all that he, who is to make repaⁱation, has.

Now, that this swallowing up of the private injury in the public, means, with respect to all injuries, other than *homicides*, this sort of *suspension*, merely, of the private injury, is well established.   *Hale* says, " by course of Common Law, A steals the goods of B, viz: fifty pounds, in money—A is convicted and hath his clergy, upon the prosecution of B.   B brings a trover and conversion for this fifty pounds, and upon not guilty pleaded, this special matter is found and adjudged for the plaintiff, because now, the party hath prosecuted the law against him, and no mischief to the Commonwealth ; but it was held, that if a man feloniously steal goods, and before prosecution by indictment, the party robbed brings trover, it lies not, for so felonies should be healed".   (1 *Hale, P. C.* 546.)   To the same effect are, *Crosby vs. Long*, (12 *East.* 409. 17 *Ves.* 327.   1 *Ch. Cr. Laws*, 5.)

Be the reasons for allowing a suit for the private injury, after the accomplishment of a suit for the public injury, what they may, they are plainly as applicable to injuries by homicide, as to any other felonious injuries—that is to say, in all cases in which the maxim of *actio personalis moritur cum persona*, does not govern.   This maxim cuts off the right of suit by the party killed, and his representatives, but not that of his master, if he has one.   But, in the case of the manslaughter of a man's servant, why should not the man, after he has prosecuted the offender to conviction, and done his whole duty to the public, be allowed to sue for his private redress, in the same manner as those who have been robbed, are, after they prosecute the robber to conviction, allowed to sue for their private redress ?   There seems to be no reason for a difference. Why, therefore, should not the maxim, where the reason is the same—the rule is the same, apply ?

I know of no authority which makes a difference in this respect, between one felony and another—which makes the word merger, mean merger in its strict sense, in reference to felonious homicide, and mean only suspension, in reference to every

other felony.  I must say, therefore, that Lord *Ellenborough's* unsupported *Nisi Prius* declaration, that "in a Civil Court, the death of a human being could not be complained of as an injury", opposed, as it is, to the expressed opinion of *Comyn*— to the, plainly to be implied, opinion of *Blackstone*—from every inference from analogy to the maxim, that where the reason is the same, the law is the same, seems to me to be too broad.  The rule by the Common Law, I think, is no broader than this.  In a Civil Court, the death of a human being cannot be complained of as a private injury, *until after* that death has been complained of in a Criminal Court, as a public injury.  The rule may be stated to be as broad as this, because every death of a human being that amounts to an injury at all, amounts, by the Common Law, as we have seen, to a felony; and in every felony, as we think we have also seen, the private injury is suspended until after the public injury has been avenged.

This is the conclusion to which we are led by the English law.  But the case is not governed entirely by that law; it is governed, in part, by our Penal Code.  That Code changes the English law in respect to the degrees of guilt in homicide.  The English law, as it now stands, makes but two degrees— homicide felonious, and homicide justifiable, or excusable— that is to say, innocent.  Our Penal Code makes them—homicide felonious, homicide less than felonious, but still not innocent, and homicide innocent.  Of the first, are murder, manslaughter voluntary, and manslaughter involuntary, in the commission of an *unlawful* act.  Of the second, is manslaughter involuntary, in the performance of a *lawful* act, "where there has not been observed necessary discretion and caution".— Of the third, are all other homicides.  Of these three degrees of homicide, the first, only, is a *felony ;* the second is but a misdemeanor.  *Code, first and fourth divisions.*

Now, in the case of a mere misdemeanor—of an offence below the degree of felony, (in the language of *Blackstone*)—of " crimes of an inferior nature, in which the public punishment is not so severe, but it affords room for a private compensation, also", as of battery, the aggressor may be indicted at the suit

of the King, and also, at the same time, be sued by the private party. In misdemeanor, there is no merger or suspension of the private injury, until after satisfaction is made for the public. (4 *Black. Com.* 6. *Jones vs. Clay,* 1 *Bos. & P.* 191. 1 *Chitty Cr. Law,* 5, 6.)

This is the English rule with respect to misdemeanors; and this Georgia has adopted. This, therefore, is the rule applicable to homicides of the degree of misdemeanors; that is to say, to homicides which are involuntary manslaughters, in the performance of a lawful act, "where there has not been observed necessary discretion and caution".

And of this degree of homicide, is the homicide described in the declaration. That homicide is alleged to have been occasioned by the negligence of the superintendent of the railroad, Wadley, whilst conveying the son of the plaintiff over the railroad; that is, whilst in the performance of a *lawful* act. If this allegation is true, Wadley was guilty of involuntary manslaughter, in the performance of a lawful act; that is to say, was guilty of a misdemeanor, and not of a felony.

[1.] It follows, therefore, that the private injury which resulted from the homicide, was not merged in the public injury, or suspended until after that had been avenged.

This being so, did *this plaintiff,* the father of the minor son killed, sustain that private injury, or any part of it? Is the right in him, to prosecute this suit?

The first count in the declaration alleges, that Wadley, the superintendent, received into the cars, &c. "William Shields, the son and *servant* of the plaintiff, an *infant* of the age of eighteen years, as a passenger, &c. to be carried", &c.; and that by the negligence of Wadley, the cars, &c. ran off the track, whereby William Shields was so greatly injured, as to die of his injuries within on hour.

[2.] May a father treat his minor son as his servant, and sue for an injury to the son, as for an injury to a servant? If the son be old enough to render service, the father may. *Flemington vs. Smithers,* (2 *Carr. & P.* 292.) *Hall vs. Hollander,* (4 *Barne. & C.* 660. *Smith Master and Servant,* 83, 84.)

In this case, the son being eighteen, was old enough to render service.

It follows that the father, in this case, had the right to sue in the manner in which he has sued, in the count aforesaid—the first count in the declaration ; and therefore, that the decision of the Court below, sustaining the demurrer to that count, was wrong.

The question as to what is the measure of damages, in such a case as that disclosed in that count, is not made, and could not be made, on this demurrer.   We may be allowed, however, to refer to *Smith's Master and Servant*, 83, 84, 85, 86, and to the citations for those pages, as containing what may be useful in investigating that question.

The second count differs from the first in this—that it alleges the said son and servant of the plaintiff, to have been received by the superintendent, Wadley, as a *hireling*, to perform certain services about the cars, &c. for which the plaintiff was to be paid.   It alleges that the injury, resulting in the death of the son, was brought about by the negligence of Wadley and his servants.

Now, Wadley, in hiring the minor son, acted simply as agent for the State.   He was the State's superintendent of the State's road.   Wadley, and his servants, and this minor son, after his hiring, were, therefore, *all* fellow-servants of a common principal—the State.   And this suit is, in effect, against that principal.

Now, the question is, does an action lie against the principal, for an injury done to a servant, by a fellow-servant, at a time when both servants are acting in the course of their common employment ?

[3.] The answer to this question, seems to us to be well given, in a late case in the English Exchequer of Pleas. In that case, the Court said : "The principle is, that a servant, when he engages to serve a master, undertakes, as between him and his master, to run all the ordinary risks of the service, and this *includes the risk of negligence on the part of a fellow-servant*, whenever he is acting in discharge of

his duty, as servant of him who is the common master of both". *Hutchinson vs. Railway Co.* (5 *Exch. R.* 351–'2.) To the same effect, is *Priestly vs. Fowler*, (3 *M. & W.* 1.)

The principle, as thus laid down, is recognized by this Court, in *Scudder vs. Woodbridge*, (1 *Kelly*, 198.)

It follows, that in this second count, the plaintiff sets forth no sufficient cause of action; and that, therefore, the demurrer was properly sustained.

But, as the demurrer to the first count was improperly allowed, the judgment allowing that demurrer ought to be reversed, and the case ought to be re-instated.